**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **CHARLES A. PEARSON,  #182691** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CV No. 2:06-CV-828-MEF** |
| | ) | |
| **K.L. BYRD, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN REPORT AND ANSWER OF DEFENDANTS, DON CORKRAN, BENJAMIN HARRISON, AND GARY REARDON TO PLAINTIFF'S MOTION TO AMEND**

**COME NOW** the Defendants, Don Corkran ("Corkran"), Benjamin Harrison ("Harrison"), and Gary Reardon ("Reardon"), by and through undersigned counsel, in response to Plaintiff's Motion to Amend and add parties and in accordance with this Court's Order of November 30, 2006, adopt and incorporate the Written Report and Answer with Affirmative Defenses and Exhibits 1 – 9 previously filed by Defendants, K.L. Byrd and C.G. Gruhn on November 6, 2006. *(Court Doc. No. 14).*

**I.  PROCEDURAL BACKGROUND**

Plaintiff Charles A. Pearson ("Pearson") was arrested on October 3, 2005.  Pearson was indicted on January 20, 2006 for theft of property in the first degree, receiving stolen property in the second degree and two counts of assault in the second degree.  *(DX 1, Certified Copy of Case Action Summary:  State of Alabama v. Charles Pearson, In the Circuit Court of Montgomery, Alabama, Case No. CC 2006-132).*  Pearson was convicted on June 29, 2006 in the Circuit Court of Montgomery County for receiving stolen property in the second degree and assault in the second degree regarding Sergeant Byrd. *(DX 1, Certified Copy of Case Action Summary:  State of Alabama v. Charles Pearson, In the Circuit Court of Montgomery, Alabama, Case No. CC 2006-132).*

On September 15, 2006, Pearson filed a three count Complaint and named as Defendants: District Attorney Ellen Brooks, Deputy District Attorney Scott Green and two detectives with the Montgomery Police Department, K. L. Byrd and C.G. Gruhn.  Count One of the Complaint alleges an illegal arrest on October 3, 2005, by Detectives Byrd and Gruhn.  Count Two alleges a claim against the state for malicious prosecution that occurred on June 28, 2006.  Count Three alleges imposition of an illegal sentence on July 27, 2006.  Pearson requests monetary damages, a declaratory judgment and injunctive relief.

On September 20, 2006, the Court entered a Report and Recommendation that (1) dismissed the § 1983 claims presented against Ellen Brooks and Scott Green with prejudice in accordance with the directives of 28 U.S.C. § 1915(e)(2)(B)(i) and (iii); (2) dismissed the plaintiff's challenge to the constitutionality of the conviction and sentence imposed upon him by the Circuit Court of Montgomery County, Alabama without prejudice pursuant to the provisions of 28 U.S.C. § 1915(e)(2)(B)(ii) and (3) dismissed the case prior to service of process in accordance with the directives of 28 U.S.C. § 1915(e)(2)(B)(i), (ii) and (iii).

On September 26, 2006, the Court granted Pearson an extension to file objections to the Report and Recommendation and also substituted page 6 of the previous Order to reflect that rather than dismiss the case prior to service of process as indicated in paragraph #3 of the Order entered on September 20, 2006 that the case with respect to the plaintiff's illegal arrest claim against defendants Byrd and Gruhn be referred back to the Magistrate Judge for additional proceedings.  Additionally on September 26, 2006, the Court allowed Pearson to amend his Complaint and assert additional claims for relief against Defendants Byrd and Gruhn but denied the motion to the extent that Plaintiff was trying to add Sgt. Johnson as an additional defendant.

The remaining claim in the Complaint against Defendants Byrd and Gruhn was for unlawful arrest.  In the Amended Complaint, Plaintiff alleged that Defendants Byrd and Gruhn violated his rights pursuant to the "Eighth and Fourteenth Amendment(s) of the U.S. Constitution cruel and unusual punishment, due process and equal protection of the law." Plaintiff also claims additional relief for the Montgomery Police Department to change their policies concerning use of force, appointment of counsel, trial by jury and punitive, compensatory and other monetary damages.

On November 6, 2006, Defendants Byrd and Gruhn filed a Written Report and Answer with Affirmative Defenses and Exhibits 1 through 9 *(Court Doc. No. 14)*.  Plaintiff's response to Defendants' Written Report was due on November 27, 2006.  On November 29, 2006, Plaintiff filed a Motion for Continuance, Motion for Extension of Time to File Response and Motion to Amend and Motion for Joinder of Persons *(Court Docs. Nos. 17, 18 & 19)*.  On November 30th, the Court granted Plaintiff's Motion to Amend as parties: Benjamin Harrison, Don K. Corkran and Gary Reardon.  *(Court Doc. No. 20)*. The Court also vacated its Order of November 7, 2006 requiring the Plaintiff file a response to the special report by November 27, 2006, denied the motion to continue and motion for an extension of time. *(Court Doc. No. 21)*.

## II.    FACTS

On Monday, October 3, 2005, Detective Guy Naquin was conducting a follow up of a death investigation and was driving west on Day Street just west of the intersection of Oak and Day Street.  *(DX 2, Naquin Affidavit)*. Detective Naquin observed a brown, four door vehicle proceed through the red light at an extremely high rate of speed. *(DX 2, Naquin Affidavit)*. The vehicle was driven by a black male with a black female occupant. *(DX 2, Naquin Affidavit)*. Detective Naquin observed the female hanging halfway out the window holding a beer can in her hand.  *(DX 2, Naquin Affidavit)*. Detective Naquin attempted to clear the intersection, but the vehicle had already traveled

to the intersection of Day Street and Mobile Street.  *(DX 2, Naquin Affidavit).* Detective Naquin observed the vehicle proceed through a stop sign sliding sideways, and proceeding North on Mobile Street and out of sight.  *(DX 2, Naquin Affidavit).*

Shortly thereafter Detective Naquin heard patrol units being dispatched to the 600 block of Mildred Street to assist a Fire Department Officer.  *(DX 2, Naquin Affidavit).*  Detective Naquin proceeded to the scene and observed the brown car that he had previously seen in a parking area behind Old Michelle's Club at the intersection of Mobile and Mildred Street.  *(DX 2, Naquin Affidavit).*

Detective Naquin arrived at the scene and saw District Fire Chief  Kenneth Bolling. *(DX 2, Naquin Affidavit and DX 3, Bolling Affidavit).*  Chief Bolling advised that he had left Fire Station #2 located at 405 South Holt Street, in route to Fire Station #10 located at 1931 Rosa L. Parks Avenue. *(DX 3, Bolling Affidavit).*  As Chief Bolling approached the store that sits near the intersection of Mobile and Mildred Street he saw a brown vehicle that looked as if it were out of control and was going to hit him head on.  *(DX 3, Bolling Affidavit).*  Chief Bolling turned his vehicle around and approached the vehicle that had stopped a few feet away.  *(DX 3, Bolling Affidavit).*

Chief Bolling witnessed a black male who was driving with a tire iron up on the steering wheel trying to get the car started.  *(DX 3, Bolling Affidavit).*  Chief Bolling asked the subject and his passenger if they were okay.  The female passenger shook her head as if she was responding, no, that everything was not okay.  *(DX 3, Bolling Affidavit).* Based on the female's behavior, Chief Bolling used his radio to request a police unit meet him in the 600 block of Mildred Street.  *(DX 3, Bolling Affidavit).*

Detective Naquin and a patrol officer that had arrived attempted to question the subject but he resisted.  *(DX 2, Naquin Affidavit).*  The officer and Detective Naquin asked the subject to identify himself.  *(DX 2, Naquin Affidavit).*  The subject advised that he did not have any identification and

became violent.  *(DX 2, Naquin Affidavit and DX 3, Bolling Affidavit).*  He began yelling and beating on the rear trunk of the patrol unit.  *(DX 2, Naquin Affidavit and DX 3, Bolling Affidavit).*

A crowd began to surround the officers and the officers made numerous attempts to get the crowd to move away from the scene.  At that time, the officers were able to determine the identity of the subject as Charles Anthony Pearson (Plaintiff "Pearson").  *(DX 2, Naquin Affidavit).*   An additional patrol unit and Detective B.F. Harrison arrived on the scene. *(DX 2, Naquin Affidavit; DX 3, Bolling Affidavit and DX 7, Harrison Affidavit).* Pearson continued to yell at the officers stating that he was not going to jail and that he would kill officers. *(DX 2, Naquin Affidavit and DX 3, Bolling Affidavit).*

Detective Naquin radioed for another patrol unit that had officers with a taser. *(DX 2, Naquin Affidavit).*   Corkran and Reardon arrived on the scene and ordered Pearson to place his hands behind his back. *(DX 2, Naquin Affidavit; DX 4, Corkran Affidavit and DX 5, Reardon Affidavit).*  Pearson took an aggressive posture and Corkran and Reardon attempted to handcuff Pearson. *(DX 4, Corkran Affidavit; DX 5, Reardon Affidavit and DX 6, Johnson Affidavit).* Pearson pulled away and Corkran deployed his taser gun.  *(DX 2, Naquin Affidavit; DX 4, Corkran Affidavit; DX 5, Reardon Affidavit and DX 6, Johnson Affidavit).* Pearson fell to the ground but continued to resist and had to be tased again. Pearson finally complied and Corkran and Reardon were able to place the handcuffs on him. *(DX 2, Naquin Affidavit; DX 4, Corkran Affidavit; DX 5, Reardon Affidavit and DX 6, Johnson Affidavit).*

As the officers attempted to place Pearson in the patrol car, he began to scream, holler, spit and kick at the officers.  *(DX 2, Naquin Affidavit; DX 4, Corkran Affidavit; DX 5, Reardon Affidavit and DX 6, Johnson Affidavit).*  Pearson had to be drive stunned again to get him to stop fighting the officers and get him inside of the vehicle and his feet shackled.  *(DX 2, Naquin Affidavit; DX 4, Corkran Affidavit; DX 5, Reardon Affidavit and DX 6, Johnson Affidavit).*

Detective Harrison radioed Sergeant Byrd at the Montgomery Police Department's Detective Division and advised that Pearson had been stopped in possession of a stolen vehicle. *(DX 7, Harrison Affidavit and DX 8, Byrd Affidavit).* Harrison advised Byrd that he was being transported to Headquarters. *(DX 7, Harrison Affidavit and DX 8, Byrd Affidavit).* Harrison advised Byrd that Pearson was still irate and they should have back up units available at Headquarters. *(DX 7, Harrison Affidavit and DX 8, Byrd Affidavit).*

Pearson arrived at the Headquarters of the Montgomery Police Department and continued to scream at officers as he was taken to Byrd's office in the Detective Division. *(DX 4, Corkran Affidavit; DX 5, Reardon Affidavit; DX 7, Byrd Affidavit).* Gruhn heard Pearson as they were taking him into the Detective Division and saw Byrd and went to help Byrd. *(DX 8, Gruhn Affidavit).*

The patrol supervisor had previously asked Byrd to get photos for the taser report of Pearson's body where he had been tased. *(DX 7, Byrd Affidavit).* Pearson continued being irate and aggressive to the patrol officers while in Byrd's office. Byrd and Gruhn asked the patrol officers to leave the room since it seemed that Pearson's anger was directed at them. *(DX 7, Byrd Affidavit and DX 8, Gruhn Affidavit).*

Detective Gruhn came in Byrd's office to assist in getting pictures of Pearson for the taser package. *(DX 8, Gruhn Affidavit).* Pearson was advised that they needed to take pictures of his body where he had been tased. Pearson stated that he was not going to allow anyone to take pictures of him. *(DX 7, Byrd Affidavit).* Sergeant Byrd lifted his shirt and Detective Gruhn stepped in front of him to take a picture. *(DX 7, Byrd Affidavit and DX 8, Gruhn Affidavit).* As Sergeant Byrd lifted his shirt, Pearson bit down on his right middle finger and would not release his bite. *(DX 7, Byrd Affidavit and DX 8, Gruhn Affidavit).* In an effort to get Pearson to release his bite, Sergeant Byrd struck him in the left side of his head with his left forearm. *(DX 7, Byrd Affidavit and DX 8, Gruhn Affidavit).* Pearson released his bite, but shoulder lunged at Detective Gruhn and pushed him against the door. *(DX 7, Byrd Affidavit and DX 8, Gruhn Affidavit).* Pearson began kicking toward Detective

Gruhn and kicked him hard in the right knee. *(DX 7, Byrd Affidavit and DX 8, Gruhn Affidavit).* Byrd and Gruhn got Pearson to the ground.  *(DX 7, Byrd Affidavit and DX 8, Gruhn Affidavit).*  Other officers then came into Byrd's office and removed Pearson.  *(DX 7, Byrd Affidavit and DX 8, Gruhn Affidavit).*  Gruhn received medical treatment from the medics and was sent to the emergency room. *(DX 7, Byrd Affidavit and DX 8, Gruhn Affidavit).*

## III.    PLAINTIFF'S CLAIMS

As previously set forth, the remaining allegation in the original Complaint is in Ground One and is a claim for "illegal arrest" by Byrd and Gruhn.  In his Amended Complaint, Pearson alleges violation of his rights pursuant to the Eighth and Fourteenth Amendment and cites cruel and unusual punishment, due process and equal protection of the law.  Pearson also uses the term of excessive force in his Amended Complaint regarding force used at the scene where he was originally detained for driving a stolen vehicle.  Although Plaintiff was allowed to add parties in his Motion to Amend or Motion for Joinder of Parties, there were no additional allegations or claims.  Given the facts alleged by the Pearson, it appears that his remaining claims are for unlawful arrest and excessive force in violation of his Fourth Amendment rights as incorporated by the Due Process Clause of the Fourteenth Amendment.

### A.  UNLAWFUL ARREST

It is well established that a claim pursuant to 42 U.S.C. § 1983 may lie for a Fourth Amendment violation where a plaintiff is arrested and detained incident thereto where such "seizure" is "unreasonable" in that it is neither pursuant to a warrant nor supported by probable cause.  *See Ortega,* 85 F.3d at 1526; *Marx v. Gumbinner,* 905 F.2d 1503, 1505-06 (11th Cir.1990); *Reeves v. City of Jackson,* 608 F.2d 644, 650 (5th Cir.1979).

Pearson contends that he did not know that the vehicle that he was driving was stolen however does not assert with specificity what Defendants did to cause him to be unlawfully arrested.

Although Byrd was ultimately responsible for processing the Affidavit and Complaint to secure the warrants, he was not the arresting officer.   Reardon, Corkran and Harrison responded to the scene to aid in apprehending Pearson.  *(DX 4, Corkran Affidavi; DX 5, Reardon Affidavit and DX 7, Harrison Affidavit)*. Neither Byrd nor Gruhn had contact with Pearson until he arrived at Headquarters to be processed on the theft of property charge for the stolen vehicle.  *(DX 7, Byrd Affidavit and DX 8, Gruhn Affidavit)*.

In the present case, it is clear that Pearson cannot succeed on a claim of unlawful arrest. Probable cause existed to arrest Pearson.  The existence of probable cause is an absolute bar to a <u>section 1983</u> action for false arrest.  In order for probable cause to exist, "an arrest [must] be objectively reasonable under the totality of the circumstances," *Bailey v. Board of County Com'rs of Alachua County, Fla., 956 F.2d 1112, 1119 (11th Cir.1992),* and an officer's subjective intentions and beliefs play no role in determining the existence of probable cause. *See Rankin v. Evans,* 133 F.3d 1425, 1433-34  (11th Cir. 1998). A "law enforcement officer has probable cause to arrest a suspect if the facts and circumstances within the officer's knowledge ... would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Bailey* at 1120 (quoting *Von Stein v. Brescher,* 904 F.2d 572, 578 (11th Cir.1990)) (Emphasis added).  Probable cause to arrest thus requires something more than "mere suspicion," *Mallory v. United States,* 354 U.S. 449, 454, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).  However probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.

It is clear from the evidence that probable cause existed for the arrest of Pearson.  Pearson was stopped while driving and in the possession of a stolen vehicle. Pearson was convicted on June 29, 2006 in the Circuit Court of Montgomery County for receiving stolen property in the second degree and assault in the second degree regarding Sergeant Byrd. *(DX 1, Certified Copy of Case*

*Action Summary:  State of Alabama v. Charles Pearson, In the Circuit Court of Montgomery, Alabama, Case No. CC 2006-132).*

**B**.        **USE OF EXCESSIVE FORCE**

When an excessive force case arises in the context of an arrest or investigatory stop, it is considered in the context of the Fourth Amendment's guarantee against unreasonable seizures. *Graham v. Conner*, 490 U.S. 386, 394 (1989)(holding that excessive force claims are properly analyzed under the Fourth Amendment and not under the substantive due process standard).  The Fourth Amendment's "objective reasonableness" standard is applied, which requires a "careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 395-396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

> The question the court must answer is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent." [*Graham*, 490 U.S. at 397].  The Supreme Court's Fourth Amendment jurisprudence has recognized that the "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.**"**  *Id*. at 396.  Consequently, the proper application of the "objective reasonableness" test requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.  Furthermore, the reasonableness of the force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.  The court must allow for the fact that "police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving..." *Id*. at 397.

Pearson was tased by officers prior to being transported to headquarters. *(DX 2, Naquin Affidavit;  DX 3, Bolling Affidavit; DX 4, Corkran Affidavit; DX 5, Reardon Affidavit; DX 6, Johnson Affidavit and DX  7, Harrison Affidavit).*      As evidenced by the sworn testimony of those present when Pearson was arrested on October 3rd, Plaintiff was aggressive and irate and

appeared to be violent and threatened to kill officers. *(DX 2, Naquin Affidavit;  DX 3, Bolling Affidavit; DX 4, Corkran Affidavit; DX 5, Reardon Affidavit; DX 6, Johnson Affidavit and DX  7, Harrison Affidavit).*

After Pearson stopped the car, Assistant Fire Chief Bolling called for assistance from Montgomery Police Department due to Pearson's actions and conduct and the reaction from the female passenger in the car with Pearson when they were stopped.  *(DX 3, Bolling Affidavit).*

After Pearson got out of the car, there was a crowd beginning to form around the officers and a man hollering at the officers. *(DX 3, Bolling Affidavit).*    The man that had been yelling then walked directly behind the officer while he was trying to get the male subject to put his hands on the car.  *(DX 3, Bolling Affidavit).* The officers present were concerned for the safety of the citizens present as well as their own safety. The officers kept telling the subject to calm down, keep his hands on the car and that they just wanted to ask him some questions.  *(DX 3, Bolling Affidavit).*

When Pearson heard the police officers say the vehicle was stolen, he lost it again, started beating on the car and saying it was his friend's car.  *(DX 3, Bolling Affidavit).* Chief Bolling became concerned with the crowd and called for Fire Unit 57, which is the back up unit for the Fire Department that has arresting powers.  *(DX 3, Bolling Affidavit).*

Corkran and Reardon arrived and the crowd began to yell negative statements at the officers, although there were a few people that told Pearson to listen to the officers.  It was several minutes before Corkran used his taser.  They were trying to allow him as much time as possible to calm down and listen to them. *(DX 2, Naquin Affidavit;  DX 3, Bolling Affidavit; DX 4, Corkran Affidavit; DX 5, Reardon Affidavit; DX 6, Johnson Affidavit and DX  7, Harrison Affidavit).*  However Pearson continued to refuse to comply and continued to be aggressive and combative.  Pearson was tased two times before he would place his hands behind his back.  *(DX 2, Naquin Affidavit;*

*DX 3, Bolling Affidavit; DX 4, Corkran Affidavit; DX 5, Reardon Affidavit; DX 6, Johnson Affidavit and DX 7, Harrison Affidavit).*

When officers attempted to put Pearson in the patrol car, Pearson began to kick and spit at the officers. Pearson was then drive stunned in his left side in order to get him to comply while we placed shackles on him. He continued to kick at the officers and be combative and was drive stunned him a second time in the left side. Pearson was then able to be restrained in the vehicle with shackles and handcuffs to be transported to the Detective Division at Headquarters. *(DX 2, Naquin Affidavit; DX 3, Bolling Affidavit; DX 4, Corkran Affidavit; DX 5, Reardon Affidavit; DX 6, Johnson Affidavit and DX 7, Harrison Affidavit).*

Furthermore as evidenced from the patrol car camera, Pearson continued to be visibly enraged and yelled at the officers and banged his head against the back glass while being transported to headquarters. *(DX 2, Naquin Affidavit; DX 3, Bolling Affidavit; DX 4, Corkran Affidavit; DX 5, Reardon Affidavit; DX 6, Johnson Affidavit and DX 7, Harrison Affidavit).*

After arriving at Headquarters, Pearson continued to be aggressive. When Byrd and Gruhn attempted to take pictures of his body to document the taser report, Pearson bit Detective Byrd on the finger. When Detective Gruhn tried to help Byrd, Pearson charged Gruhn with a shoulder lunge and ultimately kicked Gruhn in the knee. *(DX 8, Byrd Affidavit and DX 9, Gruhn Affidavit).* Gruhn required medical treatment. *(DX 9, Gruhn Affidavit).* Pearson was subsequently charged with two counts of Assault in the 2nd Degree.

To determine whether the amount of force used by a police officer was appropriate, the court must consider "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Willingham v. Loughnan*, 261 F.3d 1178, 1186 (11 Cir. 2001). The court must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490

U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). When balancing the necessity of using some force against an arrested person's constitutional rights, a variety of factors are considered, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Thus, the force used by a police officer during the course of an arrest "must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11 Cir. 2002).

All of the officers involved in the arrest and detainment of Pearson were amply justified under these circumstances in using force and the amount of force used to protect themselves and citizens in the area in trying to restore discipline and control to the situation.    From the time Pearson was stopped by the officers until the time he was booked into the City Jail, Pearson was combative, aggressive and enraged toward the officers that approached him.

The records from the Montgomery Municipal Jail do not indicate that Pearson was transported to a hospital.  *(DX 10, Montgomery Municipal Jail Records).*  In fact, the records indicate that he complained of a headache due to an injury sustained during his arrest approximately two weeks after he was arrested and only advised on the day of his arrest that he was on heart medication. *(DX 10, Montgomery Municipal Jail Records).*  Pearson saw the doctor and was x-rayed on October 31st which indicated negative results for trama.  The Eleventh Circuit has "established the principal that the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000).   Additionally, the Eleventh Circuit continues to analyze Fourth Amendment claims of excessive force in terms of whether the injuries sustained and the

amount of force applied indicate that the force was excessive. *Ruby v. Baptist Medical Center*, 21 F.Supp.2d 1341, 1350 (M.D. Ala. 1998)(citing *Gold v. City of Miami*, 121 F.3d 1442 (11th Cir. 1997); *Robinson v. Brown*, 987 F.Supp. 1470 (S.D. Fla. 1997).

### C.    QUALIFIED IMMUNITY

Additionally, based on the above, all Defendants are entitled to the affirmative defense of qualified immunity for allegations of constitutional violations pursuant to 42 U.S.C. § 1983 against Defendants sued in their individual capacities.    *See Wilson v. Strong,* 156 F.3d 1131, 1135 (11th Cir.1998).  It is obvious, from the facts and the allegations made by Pearson that the officers were at all times acting within the line and scope of their duty performing discretionary acts.

"Alabama law has defined 'discretionary acts' as ' "[t]hose acts [as to which] there is no hard and fast rule as to course of conduct that one must or must not take" and those requiring "exercise in judgment and choice and [involving] what is just and proper under the circumstances." *Williams v. Crook*, 741 So.2d 1074, 1076 (Ala.1999) *citing* Blacks Law Dictionary 467 (6th ed.1990).

Qualified immunity is an affirmative defense to an action pursuant to § 1983 against a government official sued in his or her individual capacity. *See Wilson v. Strong,* 156 F.3d 1131, 1135 (11th Cir.1998).  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988).

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

In order to receive qualified immunity, a public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F. 3d 1188, 1194 (11th Cir. 2002). As alleged by Pearson in the present case, it is undisputed that all of the officers were acting in their capacity as police officers therefore satisfying the first prong of the qualified immunity test. Having established the first requirement, the burden shifts to the Plaintiff to prove that qualified immunity is not warranted. *Id.* First "the defendant government official must prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Sammons v. Taylor*, 967 F. 2d 1533, 1539 (11th Cir. 1992). "Then the burden shifts to the plaintiff to demonstrate that the defendant 'violated clearly established constitutional law.'" *Id.*

Once the qualified immunity defense is raised, the plaintiff bears the burden of showing that the federal "rights" allegedly violated were "clearly established." *Barts v. Joyner*, 865 F. 2d 1187, 1190 (11th Cir. 1989), citing *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S. Ct. 2806, 2816, 86 L. Ed. 2d 411 (1985). For the law to be clearly established to the point that qualified immunity does not apply, it must have earlier been developed in such a concrete and factually defined contest as to make it obvious to all reasonable government actors, in the defendant's place that "what he is doing" violated federal law. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 523 (1987).

"For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel… the conclusion for every like-situated, reasonable government agent that what the

defendant is doing violates Federal law <u>in the circumstances</u>." *Lassiter v. Alabama A & M University*, 28 F. 3d 1146, 1150 (11th Cir. 1994) (emphasis in original).

Also, the Eleventh Circuit has held, "When the qualified immunity defense has been raised, an opposing plaintiff must convince the court that the law clearly established that 'the defendant's conduct in the circumstances amounted to 'deliberate indifference.'" *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1185 (11th Cir. 1994) (quoting *Edwards v. Gilbert*, 867 F.2d 1271, 1275 (11th Cir. 1989)).

Defendants are entitled to qualified immunity on Pearson's claims for unlawful arrest and excessive force. Probable cause to arrest Plaintiff and charge him with Theft of Property existed and Plaintiff was ultimately convicted. As previously set out, the officers were clearly justified under the circumstances in using force and justified in the amount of force used to protect themselves and citizens in the area in trying to restore discipline and control to the situation. From the time Plaintiff was stopped by the officers until the time he was processed into the City Jail, Plaintiff was aggressive and enraged toward the officers that approached him.


## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES

Defendants deny that all claims of  set forth Plaintiff's Complaint and Amended Complaint and.

### FIRST AFFIRMATIVE DEFENSE

Defendants assert that the Complaint fails to state any cause of action upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Defendants deny that Plaintiff is entitled to any relief and that Defendants are

entitled to dismissal of all claims.

### THIRD AFFIRMATIVE DEFENSE

Defendants plead qualified immunity and discretionary function immunity.

### FOURTH AFFIRMATIVE DEFENSE

Defendants deny all material allegations not specifically admitted and demands strict proof thereof. Defendants plead as that the Complaint is insufficient to apprise Defendants of the civil crimes or wrongs for which the Plaintiff seeks damages such that the Defendants cannot properly and reasonably defend themselves.

### FIFTH AFFIRMATIVE DEFENSE

Defendants deny that they have violated Plaintiff's constitutional rights and assert that Plaintiff has failed to state injuries or damages caused by Defendants.

### SIXTH AFFIRMATIVE DEFENSE

Defendants plead the general issue.

### SEVENTH AFFIRMATIVE DEFENSE

Defendants plead insufficiency of process.

### EIGHTH AFFIRMATIVE DEFENSE

Defendants assert that Plaintiff was guilty of negligence, wantonness, recklessness and intentional acts or criminal acts which proximately caused or contributed to the injuries or damages he claims.

### NINTH AFFIRMATIVE DEFENSE

Defendant asserts that the claims made by Plaintiff against the Defendant is completely without merit and should be dismissed as frivolous pursuant to 28 U.S.C. § 1915(e) (2) (B) (i).

## TENTH AFFIRMATIVE DEFENSE

Defendant asserts that Plaintiff's allegations of injury are, if any, of *de minimus* injury.

## ELEVENTH AFFIRMATIVE DEFENSE

To the extent applicable, Defendants plead statute of limitation, estoppel, waiver and laches.

## TWELFTH AFFIRMATIVE DEFENSE

Defendants aver that fictitious party practice is not permitted under the Federal Rules of Civil Procedure. *New v Sports & Recreation, Inc.*, 114 F. 3d 1092, 1094 n.1 (11th Cir 1997); *Edwards v Alabama Department of Corrections*, 81 f. Supp. 2d 1242, 1257 (M.D. Ala. 2000).

## THIRTEENTH AFFIRMATIVE DEFENSE

Defendants deny that Plaintiff is entitled to any monetary damages.  Defendants assert that Plaintiff is not entitled to punitive damages and that the award of punitive damages would violate the Fourth, Fifth, Sixth, Eleventh and Fourteenth Amendments of the Constitution of the United States and Article 1 §§ 6, 10, 11, 15, 22, 35, 36 and 43 of the Constitution of Alabama (1901).

## RESERVATION OF DEFENSES

Defendants reserve the right to amend these affirmative defenses as allowed by the Court.

Respectfully submitted this the 9th day of January, 2007.


/s/Kimberly O. Fehl
Kimberly O. Fehl (FEH001)
Attorney for Defendants

**OF COUNSEL:**
**City of Montgomery**
**Legal Department**
103 N. Perry St.
Montgomery, AL 36104
(334) 241-2050
(334) 241-2310 - facsimile

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document by causing it to be

placed in the U.S. Mail, postage prepaid and properly addressed on this 9th day of January, 2007

to the following:

Charles A. Pearson, Jr.
182691 (G-1-A-111)
St. Clair Correctional Facility
100 St. Clair Road
Springville, AL  35146-5582

/s/ Kimberly O. Fehl
OF COUNSEL

EXHIBITS 1 – 9

PREVIOUSLY PROVIDED WITH COURT
DOC. NO. 14 FILED NOVEMBER 6, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA, NOTHERN, DIVISION

CHARLES A. PEARSON,

    Plaintiff,

v.

    Case No.: 2:06-CV-828-MEF

K.L. BYRD, et al.,

    Defendant.

## CERTIFICATE OF AUTHENTICITY

I hereby certify that the attached is a true and complete copy of the medical records pertaining to Charles A. Pearson, DOB: 11/24/69, kept in the Montgomery City Jail.

I further certify that all records of the inmates in this facility are in the care, custody and control of the administration, and made in the regular course of business, at the time of the events, transactions or occurrences to which they refer, or within a reasonable time thereafter.

Signed this the **3rd** day of **January**, 2007.

_Shellie R. Collins_
CUSTODIAN OF INMATE RECORDS

SUBSCRIBED AND SWORN TO before me on this the **3rd** day of **January**, 2007.

_Nina Hampton Davis_
NOTARY PUBLIC


DEFENDANT'S EXHIBIT
10



| JAIL BOOKING SHEET | | |
|---|---|---|
| ORI #: AL0030100 | JACKET #: 000147331 | |
| BOOKING #: 200500006617 | | |
| NAME: PEARSON, CHARLES ANTHONY, , JUNIOR | | |
| RACE: BLACK | SEX: MALE | DOB: 11/24/1969 |
| SSN #: 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 | | |
| HEIGHT: 5'06" | WEIGHT: 200 | |

**MONTGOMERY POLICE DEPARTMENT**          **MUNICIPAL JAIL FACILITY**

Created on: Wednesday, November 08, 2006

10/03/05
11/23/05

| DATE | NOTES |
|---|---|
| 5/30/01 | Inmate escorted to this clinic for appt bite. Noted sudden onset at elbow approx 1 inch avg & swelling. Clear area & chem clean. Non-medicated. Alert & Oriented x3. — I. Mathis, LPN |
| 6/2/01 | 15c0 Pill call. 15u0 old teller — as ordered NC. Climate known. — (signature) |
| 6/11/01 | 093 0 Mobo taken as ordered. No ct noted — (signature) |
| | x3. — (signature) |
| 10/8/01 | (illegible handwritten entry) |
| | (illegible handwritten entry) |
| 10/9/05 | Approx 1130 inmate above states he had a lac to the back of his head. Stating that he fell in the infirmary during his arrest. Noted dime size hematoma to back of head. Subject stated that he has been having ↑ HA off & on. No HA at this time. Care are ind — J. McHugh |

Pearson, Charles
DOB: 11-24-1948

**NURSES NOTES**

| DATE | NOTES |
|------|-------|
| 10/31/05 | Seen for CHO c/o HA. See order — Admin |
| 03/NOV/2005 | Dr. Montea/Williams fwd/request on skull, no |
| | neuro eval given — |
| | Draw/PIV |

DOCTORS PROGRESS NOTES

NAME  Pearson, Charles

DOB  11-24-1968

CLINICAL RECORDS/DOCTORS PROGRESS NOTES

| DATE | |
|---|---|
| 5/14/01 | Inmate Pearson c/o dental pain over 1-week. States Motrin + Orajel temporary relief. Wants Dental Appt. to have it pull. Lt. ↓ wisdom tooth
B/p 140/96 T 99 P 92
— Vibramycin ○ Lorazmides
— Amoxil 875 # 20 1 po B.d.
— Darvocet-n-100 #45 x 10 days
— Motrin 800 T.d |
| 10/23/01 | [illegible signature] |
| 10/30 | x na stand
Motrin 800 T po T.d AD
x10 O. cont then
(illegible) 800mg ?
(illegible) x10/14 p |

## DOCTOR'S ORDERS (Con't)

ORIGINAL ORDERS SIGNED BY DOCTOR.
WHEN COPIED, NURSE SIGNS DOCTOR'S AND OWN NAME.

YEAR 19___

| | | DATE DISC. |
|---|---|---|
| DOCTOR'S INITIALS | | |

8/01/05 Accupril 20mg 1 PO daily
HCTZ 25mg 1 PO daily
Norvasc 5mg 1 PO QD
M.A. Santiago — AMH O.H.C.
③
② Motrin 800mg PO TID x 10 days
① Lamisil Cream Apply 14 days
Dr. Mendez 1A MH O. C.

X-ray Shoulder

CHARLES PEARSON
DOB: 11/24/68

10/31/05: _____ : Here today complaining of a rash to his feet and also a headache. He said he was hit on the head about three weeks ago and has a "blood clot". He was never x-rayed.

PE: He has an area over the right occipital parietal area about the size of a dime that is mildly tender. Neuro exam is grossly WNL.

He does have a nonpruritic scaly rash to his feet.

A: and P:

1. History of head trauma with essentially negative neuro exam. MOTRIN 800 mg one p.o. t.i.d. x 10 days. We will get a skull series.

2. Dermatosis to the feet probably fungal. LAMISIL Cream keep on person and apply b.i.d. x 14 days.

Marcial J. Mendez, M.D.
Montgomery City Jail

# SOUTHERN RADIOLOGY SERVICES, LLC
## X-RAY REPORT

| | | |
|---|---|---|
| DATE | 10/31/2005 | |
| D.O.B. | | |
| | **FIRST NAME** | CHARLES |
| **LAST NAME** | PEARSON | |
| **SEX** | | |
| | **FACILITY** | MONTGOMERY CITY JAIL |
| | **X-RAY NO.** | |

**ORDERING PHYSICIAN**
MENDEZ

MI

SKULL SERIES –FOUR VIEWS : No fracture or lytic lesion seen in the calvarium. The sella turcica is normal in size. No abnormal air fluid collections seen in the paranasal sinuses.

OPINION: Negative study.

DICTATED BUT NOT REVIEWED



Randal Finley, M.D./cdw

tt:    10/31/2005 3:04:20 PM
td:    10/31/2005 2:42:50 PM

# MEDICATION ADMINISTRATION RECORD

PEARSON, CHARLES
REPORT DATE : 10/05

| MEDICATIONS | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

HYDROCHLOROTHIAZIDE 25MG
TAKE ONE TABLET BY MOUTH
ONCE DAILY

IBUPROFEN 800MG TABLET
TAKE 1 TABLET THREE TIMES
DAILY FOR 10 DAYS

LAMISIL AT 1% CREAM
USE TWICE DAILY FOR 14
DAYS

NORVASC 5MG TABLET
TAKE ONE TABLET BY MOUTH
ONCE DAILY

QUINAPRIL 20 MG TABLET
GENERIC FOR ACCUPRIL 20MG
TAKE ONE TABLET BY MOUTH
ONCE DAILY

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| BT | | | | | | | | | | |
| S | | | | | | | | | | |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |

CHARTING FOR    10/01/05    THROUGH    10/31/05

PAGE    1  OF  1

Physician    MENDEZ, MARCIAL J
Alt. Physician    STOCK SUPPLY
Allergies

Diagnosis

| RESIDENT    PEARSON, CHARLES | Medicaid Number | Medicare Number | Approved By Doctor: | | | |
|---|---|---|---|---|---|---|
| | | | By: | | | |
| | | | D.O.B. | Sex | Room | |

Telephone No.
Alt. Telephone

Rehabilitative
Potential

Medical Record No.

302735

Title:

Patient
Code

Admission
Date:

Date:

240

escorted by a Unit at 1435 hours
C.V. M.

10-3-05
On 21:08 Inmate Charles Pearson
was removed from the North holding
cell.
J.L. Clark #2411

On 10-3-05 at approx 2135 Inmate
Charles Pearson stated that he was on
heart medication. Subject was then
offered another phone call. He then
refused and stated his
medication. He refused and stated
his heart was hurting in
the jail. Was speaking as being escorted
to the jail.
J.L. Clark #2411

10-3-05   A.D. Allen #581   3rd Shift
All equipment accounted for  even at C-



On 11-06-05 inmate Dehuer, the hours of 1810 I Officer Dean ended the cell to take inmate Pason to the Nurse Station while entering pour cell to serve inmate Pason and When I opens inmate Pason had When begin fighting, the fight was broke up by myself & Officer Dubose. Pason had Smith with his jury bitt

inmate was seen by Nurse Walther.

D. Dean #68

Shift